IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                Civil Action No. 3:24cr47

RASHAD LAROY EBRON,
                    Defendant.

## OPINION

The defendant, Rashad Laroy Ebron, faces a single-count indictment charging him with possession of a firearm after a felony conviction under 18 U.S.C. § 922(g)(1). He now moves to dismiss the indictment, arguing that the statute, which bans firearm possession by felons, violates the Second Amendment. (ECF No. 30.) Ebron has also filed a motion *in limine* seeking to exclude from trial any evidence of his alleged drug possession, his prior convictions, and any alleged affiliation he has with gangs. (ECF No. 29.)

Because the government has met its burden under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), to show that § 922(g)(1) is consistent with the Nation's history and tradition of gun regulation, the Court will deny the motion to dismiss. In light of the parties' agreement that much of the evidence Ebron seeks to exclude is irrelevant, the Court will grant Ebron's motion *in limine* to the extent it seeks to exclude evidence of drug possession and gang affiliation. The Court will also exclude evidence about Ebron's 2016 convictions related to an armed robbery.

## I. BACKGROUND

In the early morning hours of January 20, 2024, Richmond City police officers pulled over Ebron in Fairfield Court for allegedly speeding and failing to stop at stop signs. (ECF No. 34, at 2–3.) Once Ebron pulled over, the officers drew their guns and told Ebron to turn the car off.

(ECF No. 30, at 1; Def.'s Ex. 1, at 00:37–00:42.) Ebron took the keys from the ignition and got out of the car. (ECF No. 34, at 2; Def.'s Ex. 1, at 00:42–00:48.) The officers immediately handcuffed Ebron and then noticed a Ruger 9mm handgun on the front driver's side floorboard. (ECF No. 34, at 2; ECF No. 30, at 2; Def.'s Ex. 1, at 01:41.) The grand jury returned a single-count indictment charging Ebron with felon in possession of a firearm in violation of § 922(g)(1). (ECF No. 18.)

## II. DISCUSSION

### A. Motion to Dismiss the Indictment

In 2022, the Supreme Court in *Bruen* held that New York's public-carry law—which required an applicant to demonstrate a "special need" for a public-carry gun permit—violated the Second Amendment. 597 U.S. at 70–71. *Bruen* followed years of confusion stemming from the Court's 2008 decision in *District of Columbia v. Heller*, in which the Court determined that the Second Amendment protects a person's right to keep a handgun in the home for self-defense. 554 U.S. 570, 635 (2008). Although *Heller* used "text and history" to come to that conclusion, *id.* at 595, *Heller* did not set a clear test for determining whether a gun regulation violated the Second Amendment. Without a clear test from the Supreme Court, lower federal courts developed "a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Bruen*, 597 U.S. at 17. In *Bruen*, however, the Supreme Court rejected the two-step, means-end scrutiny analysis as "one step too many." *Id.* at 19. Yet the Court went on to impose its own two-step test for reviewing whether a law violates the Second Amendment. *Id.*

First, *Bruen* instructs courts to ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If so, "the Constitution presumptively protects that conduct." *Id.* The second step then places the burden on "the government [to] justify its regulation by

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* To meet that burden, the government must "identify a well-established and representative historical *analogue*," to the modern regulation, "not a historical *twin*." *Id.* at 30.

"[W]hen it comes to interpreting the Constitution, not all history is created equal." *Id.* at 34. *Bruen* set the primary focus on "the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37. As for other historical evidence, courts must walk the line between not giving too much credit to "[h]istorical evidence that long predates" ratification, while also "guard[ing] against giving postenactment history more weight than it can rightly bear." *Id.* at 35. Even still, pre- or post-ratification history can supplement Founding Era history and shed light on the Nation's history and tradition of gun regulation. *See id.* at 36–37. But "to the extent later history contradicts what the text says, the text controls." *Id.* at 36.

In the years between *Heller* and *Bruen*, the Fourth Circuit held in a series of cases that the Second Amendment does not prohibit disarming people who commit certain crimes. *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) (considering 18 U.S.C. § 922(g)(9), which disarms those "convicted in any court of a misdemeanor crime of domestic violence"); *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) (finding § 922(g)(1) constitutional as to violent felons); *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012) (extending *Moore*'s reasoning to nonviolent felons).

But as Ebron rightly notes, *Bruen* "upended Second Amendment doctrine" by imposing a more specific test than that in *Heller*. (ECF No. 30, at 1.) *Chester* "created a test that combines a historical inquiry with means-end scrutiny." *United States v. Coleman*, --- F. Supp. 3d ----, 2023 WL 6690935, at *4 (E.D. Va. Oct. 12, 2023). And rather than applying text and history as *Bruen* requires, *Moore* and *Pruess* relied on *Heller*'s remark that gun bans for felons were "presumptively lawful." *See Moore*, 666 F.3d at 317–19; *Pruess*, 703 F.3d at 245–46. *Bruen* therefore abrogated

3

those cases to the extent they rely on those rationales. But to the extent the Fourth Circuit's cases engaged in a historical analysis of the Second Amendment and § 922(g)(1), those cases remain relevant. *Coleman*, 2023 WL 6690935, at *5 (keeping "the Fourth Circuit's [pre-*Bruen*] precedent in mind" while applying *Bruen*). With that in mind, the Court proceeds to consider the constitutionality of § 922(g)(1) under *Bruen*'s two-step test.[1]

### 1. Bruen *Step One – The Text*

The Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. *Bruen* definitively asserts that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." 597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581). *Heller*, too, began its analysis "with a strong presumption that the Second Amendment right . . . belongs to all Americans." *Heller*, 554 U.S. at 581.

The government pushes for a narrower definition of "the people," pointing to *Bruen*'s and *Heller*'s general statements that the Second Amendment protects the rights of "law-abiding" and "responsible" citizens. *See, e.g.*, *Bruen*, 597 U.S. at 8 ("ordinary, law-abiding citizens"); *Heller*,

---

[1] Many courts have expressed their skepticism and criticism of the corner the Supreme Court backed lower courts into with *Bruen*'s history-and-tradition framework and constitutionality-by-analogy analysis. *See, e.g.*, *United States v. Bullock*, 679 F. Supp. 3d 501, 530–31 (S.D. Miss. 2023) (observing that "[t]he new standard has no accepted rules for what counts as evidence" and "remains susceptible to accusations of political bias"); *United States v. Hill*, --- F. Supp. 3d, 2023 WL 8238164, at *10–11 (E.D. Va. Nov. 28, 2023) ("[T]he *Bruen* test defies an intellectually accurate application that would ensure 'the consistent and uniform development and application of the law.'" (quoting *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019))); *United States v. Washington*, 2023 WL 8258654, at *5–6 (N.D. Ill. Nov. 29, 2023) (chastising the "ignorance and insensitivity" of using our Nation's history of slavery and racist laws to justify § 922(g)(1), especially "considering the realities of how [§] 922(g)(1) is enforced against primarily Black Americans"). Nonetheless, this Court has no choice but to faithfully apply *Bruen* to the best of its ability.

554 U.S. at 635 ("law-abiding, responsible [citizens]").  Moreover, the government notes that the Supreme Court in *Heller* said that "the people . . . unambiguously refers to all members of the *political community*."  (ECF No. 34, at 4 (quoting *Heller*, 554 U.S. at 580).)  Historically "felons were not part of the political community" and could lose their "political right[s]," such as holding public office, voting, or serving on juries.  (*Id.* at 7, 10.)

Despite *Heller*'s and *Bruen*'s use of the terms "law-abiding" and "responsible," those decisions also said the Second Amendment applies to "all Americans."  *Heller* compared the use of "the people" in the Second Amendment to the use of "the people" in the First, Fourth, Ninth, and Tenth Amendments, suggesting the phrase means the same in each amendment.  *See* 554 U.S. at 580 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).  The government's interpretation would conflict with the text of the Second Amendment and with long-standing interpretations of the four other instances of "the people" in the Bill of Rights.  *See* 2023 WL 6690935, at *5–6; *Fraser v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 672 F. Supp. 3d 118, 130–31 (E.D. Va. 2023).  The Second Amendment does not qualify "the people." And as *Bruen* emphasized, step one requires a review of the Amendment's text.  The Second Amendment right applies to "all Americans."  *Bruen*, 597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581).  That includes convicted felons.

The Second Amendment covers not just felons as a class but also the conduct § 922(g)(1) outlaws: possession generally.  *See id.* at 17 (explaining that at step one a court must consider whether "the Second Amendment's plain text covers an individual's conduct").  *Bruen* said that 'all Americans" have "the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions."  *Id.* at 70 (quoting *Heller*, 554 U.S. at 581).  And *Heller* explained that Americans have the right to keep handguns in their homes for self-defense.  *Heller*,

554 U.S. at 635. By completely banning firearms possession for a class of people, § 922(g)(1) infringes on the conduct that *Bruen* and *Heller* said the Second Amendment protects. Because Ebron's conduct falls within the plain text of the Second Amendment, the Court must next consider *Bruen*'s second step.

### 2. Bruen *Step Two – History & Tradition*

Under *Bruen* step two, the government bears the burden of showing that § 922(g)(1) accords with the Nation's history and tradition of firearms regulation. To meet that burden, the government must point to analogous predecessors to the contemporary regulation. Of course, "the Constitution can, and must, apply to the circumstances beyond those the Founders specifically anticipated," so *Bruen*'s analogical reasoning requires "a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30.

*Bruen* optimistically suggests that its history prong will, "[i]n some cases," be "fairly straightforward." *Id.* at 26. A court can, for example, use "the lack of a distinctly similar historical regulation addressing" a "general societal problem that has persisted since the 18th century" as "relevant evidence" to find the modern law violates the Second Amendment. *Id.* In other cases, where the government has no "distinctly similar" historical analogue, it can cite to "relevantly similar" analogues, which may serve as comparators on a higher level of generality. *See id.* at 27–30. To evaluate whether a historical regulation counts as "relevantly similar," *Bruen* established two "metrics" for consideration. *Id.* at 29. First, the Court must consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense," and second, "whether that burden is comparably justified." *Id.*

Ebron argues that "[§] 922(g)(1) is the first law in our nation's history to broadly prohibit all felons from possessing a firearm" and that no law during the Founding Era explicitly banned

gun possession by felons. (ECF No. 30, at 15.) But the fact that no "historical twin" existed at the Founding does not doom the government's attempt to prove that a modern regulation comports with the Nation's history and tradition of gun regulation. *See Bruen*, 597 U.S. at 30.

The government argues that history shows "Congress may disarm persons who are not law-abiding, responsible citizens." (ECF No. 34, at 11.) To justify § 922(g)(1), the government recounts the States' ratification debates and the proposals that led to the Second Amendment. For example, during the Constitution's ratification, the Address and Reasons of Dissent of the Minority of the State of Pennsylvania to their Constituents objected to the lack of a bill of rights and proposed that "no law shall be passed for disarming the people or any of them unless for crimes committed." (*Id.* at 15 (citing Bernard Schwartz, 2 *The Bill of Rights, A Documentary History* 622, 665 (1971)).) The objections from the Pennsylvania minority led directly to the drafting and ratification of the many of the amendments in the Bill of Rights—including the Second Amendment. (*Id.*) During the Massachusetts convention, Samuel Adams suggested adding a provision so that "the said Constitution be never construed to authorize Congress . . . or to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." (*Id.* at 15–16 (citing Stephen J. Halbrook, *The Founders' Second Amendment* 171, 191–93 (2008).) Although those proposals failed, New Hampshire's delegates passed a similar proposal during its constitutional convention. (*Id.* at 16.) The New Hampshire proposal said that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion"—which reflected societal alarm over the recent Shays' Rebellion. (*Id.* (citing Halbrook, *supra* at 213).)

Together, these proposals from the States' constitutional conventions demonstrate a widely shared belief that the government could limit possession of firearms based on safety concerns. Indeed, the Court in *Heller* described the Pennsylvania minority's proposal as "highly influential"

in the drafting of the Second Amendment.  554 U.S. at 604.  Moreover, those proposals shared similar burdens and justifications with § 922(g)(1)—they aimed to ban gun possession among classes of people, including those convicted of crimes or involved in dangerous activity, due to safety concerns.  *See Bruen*, 597 U.S. at 29 (looking at "whether modern and historical regulations impose a comparable burden on the right of armed self-defense," and "whether that burden is comparably justified").

Even if these constitutional proposals alone did not establish a history and tradition of limiting firearms ownership for certain classes of people based on security concerns, other Founding Era laws strengthen that interpretation of the historical record.  For example, a resolution adopted by Williamsburg, Massachusetts, in 1780 recognized the "essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Lawfull Subjects of Government we Ought Never to be deprived of them." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966).  More generally at that time, many States often applied the status of "civil death" to felons.  *See, e.g.*, *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888).  A felony conviction triggered "an extinction of [the offender's] civil rights," *id.*, including the "right to vote, to sit as a juror," and "to bear arms," *id.* at 156 (Earl, J. dissenting); *see also United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) ("Early legislatures also ordered forfeiture of firearms by persons who committed non-violent hunting offenses, and they authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property." (citations omitted)).  And "[i]n the decades after ratification," States continued to "adopt[] regulations infringing on the right of felons, and

lawbreakers like felons, to bear arms." *Coleman*, 2023 WL 6690935, at *12; *see Bruen*, 597 U.S. at 35–36 (acknowledging that post-ratification history can supplement Founding Era history).

This long history of disarming classes of people based on dangerousness and lawbreaking has led "circuit and district courts nationwide"—both before and after *Bruen*—to hold that § 922(g)(1) does not violate the Second Amendment. *See Coleman*, 2023 WL 6690935, at *15.[2] And those courts' conclusions accord with the Fourth Circuit's pre-*Bruen* assessment of the history. The Fourth Circuit in *Pruess* observed that "the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'" 703 F.3d at 246 n.3 (citing *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012)). Even the Supreme Court remarked in *Heller* that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful." 544 U.S. at 626–27, 627 n.26; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) ("repeat[ing] those assurances" made in *Heller* that "our holding did not cast doubt" on felon disarmament). Accordingly, § 922(g)(1) does not violate the Constitution as applied to Ebron.[3]

### B. *Motion* in Limine

Ebron asks the Court to exclude any evidence or testimony of (1) his alleged marijuana possession, (2) his alleged gang affiliation, and (3) "the number and nature" of his previous felony

---

[2] *See, e.g., Jackson*, 69 F.4th at 505; *Coleman*, 2023 WL 6690935, at *12; *see also, e.g., United States v. Riley*, 635 F. Supp. 3d 411, 426–28 (E.D. Va. 2022) (applying *Bruen* in the alternative to find that § 922(g)(1) is consistent with history and tradition). The government has also provided a list of almost 200 post-*Bruen* cases in which federal courts across the country have found § 922(g)(1) is constitutional. (ECF No. 34-1.)

[3] Ebron brings both an as-applied and facial challenge to § 922(g)(1). But because the government has shown the law is constitutional as applied to him, it necessarily follows that he cannot show that the law is unconstitutional in every application. *See Fusaro v. Howard*, 19 F.4th 357, 373–74 (4th Cir. 2021).

convictions. (ECF No. 29, at 1.) He argues that this evidence is not relevant, would violate Federal Rule of Evidence 403 as unduly prejudicial, and serves no legitimate purpose under Federal Rule of Evidence 404(b).

The government says it "does not intend to introduce evidence related to [Ebron's] possession of marijuana or prior gang participation in its case in chief," agreeing that such "evidence is not relevant" to making its case under § 922(g)(1). (ECF No. 35, at 2.) Accordingly, the Court will exclude that evidence.

Turning to Ebron's prior convictions, the parties have agreed to a stipulation regarding Ebron's felon status and his knowledge of that status at the time of the offense. The parties disagree, however, on the admissibility of Ebron's 2016 convictions for robbing a pizza-delivery driver at gunpoint in 2015.

The Court will exclude the evidence of the 2016 convictions related to the robbery. Rule 404(b) allows for the admission of prior bad acts for a non-propensity purpose so long as the prior bad act is not unfairly prejudicial or "substantially outweighed by confusion." *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997) (describing Rule 404(b)(2)). Although the government has pointed to non-propensity purposes for the 2016 convictions—including proving Ebron's knowledge of and intent to possess the gun—the evidence also "must be relevant to an issue." *Id.* "The more closely that the prior act is related to the charged conduct in time, pattern, or state of mind, the greater the potential relevance of the prior act." *United States v. Hall*, 858 F.3d 254, 267 (4th Cir. 2017) (quoting *United States v. McBride*, 676 F.3d 385, 397 (4th Cir. 2012)).

While both the 2016 convictions and the instant offense involve a firearm, the similarities end there. Moreover, the robbery occurred "eight and a half years before the allegation in this case." (ECF No. 38, at 2.) "The significant passage of time between" the events "undermines any

relevance [Ebron's 2016 convictions] may have." *See Hall*, 858 F.3d at 273 (reversing the admission of prior drug convictions where the "most recent . . . occurred five years" before the charged conduct"). Given "[t]he lack of factual similarity and temporal proximity," the 2016 conviction has little relevance to the charged conduct. *See id.* at 273. And even if the convictions were relevant under *Queen*, telling the jury about Ebron's previous armed-robbery convictions as they consider this case—one involving the simple possession of a gun—would unfairly prejudice him by allowing the government to make what essentially amounts to a propensity argument. The lack of factual similarity and temporal proximity lessen the probative value of the 2016 convictions and would only exacerbate the danger of prejudice they pose. Accordingly, the Court will exclude the 2016 convictions.

### III. **CONCLUSION**

For the foregoing reasons, the Court finds that § 922(g)(1) does not conflict with the United States's history and tradition of gun regulation and thus does not violate the Second Amendment under *Bruen*. The Court will therefore deny Ebron's motion to dismiss the indictment. (ECF No. 30.) The Court will grant Ebron's motion *in limine* to the extent it seeks to exclude evidence of his marijuana possession, gang affiliation, and the specifics of his 2016 convictions. (ECF No. 29.)

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 9 May 2024
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

11